| .BYRNES, Judge.
Just when we thought it was “safe to go back in the water” in connection with the appealability of partial judgments under LSA-C.C.P. art. 1915 B, along comes the instant case proving that this Court was right when we said in Batiste v. King, 98-1813 (La.App. 4 Cir. 2/10/99), 729 So.2d 674,1999 WL 74641, that “each case seems to raise some new twist in what fast seems to be becoming an apparently limitless set of distinguishable differences depending on the facts that makes the fixing of guidelines very difficult.” In this case, on September 17, 1997, the lower court granted an exception of no cause of action, dismissing plaintiffs claim against only one out of several defendants, the corporate entity known as “Dr. Greenberg, An Optometry Corporation,” hereinafter referred to as the “Optometry Corporation.” Neither the lower court nor the parties certified this judgment as final in accordance with the provisions of LSA-C.C.P. art. 1915 B. The plaintiff took a devolutive appeal (98-CA-0327) from the judgment. Normally we would dismiss such an appeal as being a non-final partial judgment. Id.
However, in what gives this case its novel twist, on May 29, 1998, the trial court rendered a summary judgment against the remaining defendants, Peter Brown and Marjorie Greenberg, Testamentary Executrix of the Succession of Tom I. Greenberg, disposing of the case on the merits in its entirety. (In the same | ¿judgment the trial court denied the defendants Brown and Marjorie’s cross motion for summary judgment.) These two defendants took a suspensive appeal (98-CA-2547) from the 1998 judgment which was consolidated with the earlier devolu-tive appeal.
This Court has taken the position that the timeliness of an appeal is determined at the time it is lodged. Id. In the case of the 1997 judgment dismissing only the Optometry Corporation, the judgment was not final at the time it was lodged. Although there are policy considerations favoring judicial economy and disfavoring piecemeal appeals which have led to this Court’s insistence on requiring parties to adhere to the requirements of LSA-C.C.P. art. 1915 B for designation of partial final judgment in a fairly strict and literal fashion, those same policy considerations do not apply to the instant case where we have two partial judgments, but by a fluke of consolidation we can also say that we have the entire case before us. Thus, in the instant case, if we were to mechanically apply the rule regarding the timing of appeals set forth in Batiste v. King, supra, we would create unnecessary piecemeal appeals and defeat the goal of judicial *265 economy, while doing nothing to further the legislative intent of LSA-C.C.P. art. 1915 B. Therefore, having developed a new appreciation for the expression, “never say never,” we reaffirm what we said in Batiste v. King about the timeliness of appeals of partial judgments, but recognize the instant fact situation as a legitimate exception to that rule.
In November of 1996, .the defendant, Marjorie 0. Greenberg, Testamentary Executrix of the Succession of Tom I. Green-berg (“Marjorie”), and Peter Brown (“Peter”) entered into an agreement to sell all of the issued and outstanding corporate stock of Dr. Greenberg, An Optometry 1 ¡¡Corporation (“Optometry Corporation”), to NKP Vision Center, Inc. (“NKP”). The Optometry Corporation was a professional optometry corporation pursuant to LSA-R.S. 12:1110 et seq. NKP is a business corporation. NKP put up a $100,000.00 deposit. The agreement called for a closing on January 15,1997.
LSA-R.S. 12:1114 B specifies that:
Only a shareholder who is a natural person duly licensed to practice optometry in this state, and who holds his shares in his own right, shall be entitled to vote such shares, and to participate in the corporation’s earning. Any other shareholder shall have no voting rights for any purpose whatsoever, shall not participate in the corporation’s earnings, and shall have no access to any records or communications pertaining to optometry services rendered by, or any other affairs of, the corporation, except as provided in R.S. 12:1122(B). [Emphasis added.]
While he was living, Tom Greenberg, the late husband of the defendant, Marjorie, was the only shareholder licensed to practice optometry as required by LSA-R.S. 12:1114 B. Upon his death, no licensed shareholder remained.
By letter dated January 9, 1997, Peter Butler, original counsel for NKP, advised Leon Rittenberg, counsel for Peter Brown and Marjorie, that LSA-R.S. 12:1114 B prohibited Marjorie from voting the shares of the Optometry Corporation to convert it to a business corporation. Butler’s letter proposed as an alternative that the Optometry Corporation be dissolved pursuant to the provisions of LSA-R.S. 12:1122 B, for which, purpose Marjorie would be permitted to vote the shares. Once this was accomplished, Butler’s letter indicated that NKP would purchase the assets of the liquidated corporation in accordance with the terms of the original purchase agreement. Failing this, Butler demanded the return of NKP’s $100,000.00 deposit and requested the quickest possible reply to his letter.
14However, only a few days later, on January 14-15, the parties entered into the first extension agreement, resetting the sale date for January 29, 1997. The relevant language of the extension is as follows:
2. The Purchaser acknowledges that it is and has been aware of the fact that Dr. Greenberg, An Optometry Corporation, is in fact an optometry corporation and not a business corporation, and that it is aware of the provisions of R.S. 12:1110, et seq. And, in particular, the provisions of R.S. 12:1122B.
3. If requested so to.do on the date of the sale, Mrs. Marjorie O. Greenberg shall vote the stock of Dr. Tom Green-berg in said corporation to convert said corporation from an optometry corporation to a business corporation immediately prior to the sale and will execute an Amendment to said corporation’s Articles of Incorporation reflecting said vote.
4. The Purchaser acknowledges that its obligations hereunder are not impacted by the fact that Dr. Greenberg, An Optometry Corporation, is an opto-metric corporation and not a business corporation. ■
5. All of the parties hereto further acknowledge that the aforesaid agree *266 ment is in full force and effect except as modified herein.
On February 12-13, 1997, for the second time the parties entered in to an agreement extending the date of the sale. In this second extension the date was fixed for Thursday, March 6,1997. This Second Extension Agreement increased the deposit amount by an additional $50,000.00. The sixth numbered paragraph of the second extension agreement is of particular significance to the instant litigation:
Seller shall make a good faith effort to obtain the approval of the landlord of each subsidiary of Dr. Greenberg, An Optometry Corporation, to the proposed purchase by documents mutually satisfactory to the Purchaser, the Seller and each respective landlord. In the event that Seller is ^unable to obtain the permission of the landlords in twelve (12) of its aforesaid seventeen (17) leases, then Purchaser may elect to terminate this Agreement. If this Agreement is so terminated, Purchaser is entitled to the return of its deposit.... [Emphasis added.]
Annexed to the Second Extension Agreement were a number of documents which the parties agreed to execute in connection with the sale of the stock. Among those documents were a consent to amend the articles of the Optometry Corporation to be executed by the sole shareholder, Marjorie Greenberg, along with the form of the actual amendment to the corporate charter.
NKP did not appear on March 6 at the scheduled time for the closing of the sale, whereupon the attorney for the defendants wrote to the attorney for the plaintiff putting them in default for failure to turn up at the scheduled closing, stating in pertinent part that:
Out of an abundance of caution, I believe that it is appropriate for me to write and confirm that your clients failed to show up this afternoon for the purchase of the stock in Dr. Greenberg, An Optometry Corporation. My clients have fulfilled all of their obligations and were prepared to deliver the stock and all of the required documentation. Therefore, your clients are in default and my clients have asked me to request that NKP Vision Center, Inc. forward to me a letter authorizing me, as escrow agent, to turn over to the sellers their deposit. However, as I mentioned to you on the telephone this afternoon, my clients are still desirous of selling their stock and are still willing to consider a sale to your clients so long as they have not previously sold the company to others or decided to retain it. If they consummate a sale with your clients within the near future, they have agreed to credit against any purchase price the forfeited deposit so long as I have been authorized to turn the deposit over to them by Monday at 9:00 a.m. [Emphasis added.]
I am sorry that your clients ran into such financing problems at the bank and hope that they can arrange |fiquickly some alternative financing. Please keep me advised since I would not be surprised if in about a week’s time my clients start contacting the other prospective purchasers.
On March 10, 1997, Robert Stassi, NKP’s attorney replied by letter:
In accordance with your letter request of March 7, you are authorized to disburse the funds on deposit, which will be credited to the purchase price in the event my clients purchase the business. We would ask that your client convert the company to a business corporation at this time in order to avoid the same problem with the next lender. [Emphasis added.]
By letter dated April 21, 1997, Frank H. Walk, Jr. wrote a letter to the defendants’ attorney informing him that Walk had been associated as counsel for NKP. This letter made demand on the defendants for the first time for the return of the $150,-000.00 deposit, based on the contention *267 that the agreement to sell was an illicit contract under LSA-R.S. 12:1110 et seq., relating to professional optometry corporations, rendering the agreement an absolute nullity under LSA-C.C. art.2033.
When the defendants did not return the deposit as requested, NKP filed this suit on June 25, 1997, demanding the return of the deposit. It subsequently filed an amended petition. On March 23, 1998, NKP directed requests for admissions to the defendants inquiring about the status as of March 6, 1997, of the landlord approvals of the proposed transaction.
NKP contends that the defendants did not obtain the required number of landlord approvals prior to the closing, thereby giving NKP the right to terminate the agreement and entitling it to a return of its $150,000.00 deposit. NKP’s right to terminate the agreement under paragraph six of the Second Extension is not an ipso facto, automatic, self-executing right. NKP must elect to exercise the right.
|7Had the requirement that the defendant produce the lease assignments been absolute rather than requiring the NKP to exercise its right of election, then NKP might be able to argue that the defendants’ default demand was ineffective, based on the theory that defendants had no right to default NKP unless they could first show that they were prepared to perform.
The defendants argue that NKP lost its right to terminate the agreement by failing to exercise that right prior to the time of the scheduled closing. Not only did NKP fail to exercise its Second Extension paragraph six right of termination at the scheduled closing, four days later on March 10, 1997, NKP agreed to surrender the deposit to the defendants. NKP waited until some six weeks after the March 6, 1997 closing date before demanding a return of the deposit. Even then NKP’s demand for the return of its deposit was not based on paragraph six of the Second Extension. It was based instead on NKP’s assertion that the agreement was an absolute nullity.
In the trial court, counsel for NKP made the following argument at the close of the hearing on the motions for summary judgment which the trial court found persuasive:
Well, since the contract had no time limit in which you couldn’t request a termination for return of deposit I don’t see how forty six days is either undue or burdensome to them or in violation of the contract. And I think they owe the deposit back because there’s a windfall to it.
BY THE COURT:
And I agree and I’m going to grant your motion for summary judgment.
First, there is no merit in NKP’s contention that the forfeiture of its-deposit would be a windfall to the defendants. In effect NKP implies that the defendants | swill be unjustly enriched if allowed to keep the deposit now that the sale can no longer be consummated. (Apparently, when the sale to NKP fell through, the defendants sold to a third party.) In contemplation of the law this is not true. The deposit prevented the defendants from selling to other parties during the term of the agreement and its extensions. The law does not consider it a windfall to the recipient when deposit money or option money is forfeited in accordance with the terms of the contract. There is nothing in this case to suggest that NKP’s $150,-000.00 deposit was anything other than the result of a freely negotiated, arms length transaction. The fact that NKP ended up with nothing tangible when the deal fell through does not mean’ that NKP did not receive full and adequate legal consideration for the deposit in the form of an incorporeal right. The forfeiture of the deposit creates no equities in favor of NKP. We know of no authorities that state that the cause of those who forfeit deposits is favored or which create any presumptions favoring the return of deposits to *268 those who have voluntarily relinquished them.
Second, although the agreement contains no explicit time limit for the exercise of the election to terminate, this Court finds that implicit in the agreement as a whole is the understanding that the election to terminate must be exercised at the time scheduled for the closing, which time was fixed precisely in the Second Extension as to both date and hour. NKP offers no admissible evidence extrinsic to the agreement that would suggest that it was the intention of the parties to leave the timing of the election to terminate open ended. Moreover, even were we to assume for purposes of argument that no time limit was intended by the agreement, then we would have to find that when NKP voluntarily agreed to relinquish its | ndeposit, then certainly at that point NKP waived its paragraph six right to elect to terminate the agreement.
But NKP counters that it agreed to the voluntary surrender of its deposit only in reliance upon the representation in the default letter from the defendants’ counsel of March 6, 1997, that the defendants were prepared to deliver all of the “required documentation,” which documentation would have included the lease assignments. NKP further asserts that it was only after it received the response to its request for admissions some time later that it learned for the first time that the representation in the default letter was a mispresentation. The record does not support NKP in this regard. Mr. Perroncel, the president of NKP, testified by deposition that, “I was aware on March 5 th that we did not receive all of the lease assignments.” Mr. Petroncell was also asked:
Q. Isn’t the truth of the matter you didn’t show up because you didn’t have the money to pay for the business?
A. That’s correct, at that time.
NKP in its brief contends that the defendants’ reference to Mr. Perroncel’s brief statement regarding his prior knowledge “is not a clear representation to this Court as to his testimony.” However, NKP offers no evidence to contradict this testimony or to show that it has been taken out of context in such a way as to distort its meaning. NKP’s arguments to the contrary are not evidence. NKP knew in advance of the hearing on the motions for summary judgment that the defendants would offer this testimony at the hearing because a copy of it was annexed to the defendants’ Statement of Material Facts. But in responding to the defendants’ position, NKP made no objection to the testimony and did not request additional discovery pursuant to LSA-C.C.P. art. 967. NKP offers no |incountervailing affidavit of Mr. Perroncel or any other evidence that would have the effect of limiting, modifying, or explaining away Perroncel’s admission that he knew of the lack of landlord approvals prior to the time of the sale and prior to the time NKP voluntarily relinquished its deposit. NKP contended below that when Mr. Perroncel failed to exercise his right to elect to terminate the agreement because of the defendants’ failure to obtain the requisite number of lease assignments, it was in reliance on his then attorney Mr. Stassi who was laboring under an error of law concerning the validity of the sale agreement. Even if we accept for purposes of argument that the agreement was an absolute nullity unbeknownst to NKP, that still would not have prevented NKP from exercising its right at the time scheduled for the closing to demand a return of its deposit based on Mr. Perroncel’s knowledge that the defendants had not obtained all of the required lease assignments. In other words, the failure of NKP to exercise its Second Extension paragraph six election to terminate cannot be attributed to any error of law concerning the validity of the agreement.
In order to synthesize the foregoing and reach a conclusion we find the following: It is undisputed that NKP failed to attend *269 the sale. It is undisputed that NKP voluntarily agreed to forfeit its deposit several days later. It is undisputed that NKP made no complaint about the failure of the defendants to obtain the desired number of lease assignments on the date scheduled for the closing, or four days later when NKP agreed to relinquish its deposit voluntarily, or several weeks later when NKP first demanded a return of its deposit, in spite of the fact that Mr. Perroncel, president of NKP, knew of this shortcoming prior to all of these dates. NKP did not fail to attend the sale because of any reliance on any representations concerning the lease assignments made by the defendants attorney in the default Inletter because that letter was not written and sent until after NKP failed to attend the sale. NKP did not agree to the forfeiture because it was deceived by the default letter. NKP agreed to the forfeiture because, as Mr. Perroncel testified, he still hoped to consummate the deal at some time in the near future at which time NKP would receive credit for the relinquished deposit. From this testimony, coupled with Mr. Perroncel’s previously' quoted testimony that he knew that the defendants did not have the required lease assignments, we may reasonably infer that NKP agreed to the deposit surrender with full knowledge of the lack of lease assignments because it wanted to keep the deal alive and felt that the prospects of concluding the $2,500,-000.00 deal (which would include the credit for the $150,000.00 deposit), were worth the risk to the $150,000.00 deposit. In other words, NKP waived its right to terminate the agreement and recover its deposit based on the defendants’ failure to obtain the lease assignments because to do so might kill the deal, a deal of such magnitude and so desirable as to make the risk to the $150,000.00 appear to be a reasonable business decision at that time. NKP has offered nothing that would raise a genuine issue of material fact contrary to this conclusion.
NKP failed to exercise its right to elect to terminate the sale in a timely manner when it failed to attend the sale, or it waived that right when it voluntarily agreed to the surrender of its deposit. Although NKP contests some of these conclusions in argument, it has offered no evidence sufficient to elevate its contentions to the status of genuine issues of material fact. Accordingly, we find that unless the agreement is an absolute nullity, the defendants have established their right to retain the deposit.
 hpNKP contends that the sale agreement is an absolute nullity under LSA-C.C. art. 2033, which provides that: “A contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral.” The effect of NKP’s argument is that even if the defendants are allowed to keep the deposit under the terms of the agreement, NKP is still allowed to recover it because the entire agreement is an absolute nullity. NKP bases its argument on the fact that no shareholder of the Optometry Corporation remains who is “duly licensed to practice optometry in this state.” LSA-R.S. 12:1114 states that only those shareholders “duly licensed to practice optometry in this state” may vote the shares of the corporation for any purpose other than dissolution under LSA-R.S. 12:1122. Therefore, according to NKP’s reasoning, Marjorie’s agreement to vote the shares of th'e corporation for the purpose of converting it into a business corporation, which NKP contends is a “cause” of the sale agreement, is an absolute nullity.
By letter dated January 9, 1997, NKP’s then attorney, Peter Butler, wrote a letter to the defendants’ attorney containing the' following particularly relevant paragraph:
It is apparent from the above statute that the Executrix of the Succession cannot vote the shares of the Optometry Corporation to convert it to a Business Corporation. It is also apparent that the Executrix of the Succession agreed and bound herself to something which she is legally incapable of doing, i.e., *270 selling the shares of an Optometry Corporation to a Business Corporation.
However, in order to accommodate the Executrix of the Succession, my client would be willing to do the following: If the Executrix of the Succession would vote the shares of the Optometry Corporation to be elected a Director and Officer of the Optometry Corporation for the purpose of effectuating a voluntary dissolution and liquidation of the Optometry Corporation in compliance with Section 1122B referred to above, my client will | ^purchase the assets of the Optometry Corporation in accordance with the terms and conditions of the Purchase Agreement. [Emphasis added.]
The professional corporation statutes found in Title Twelve of the Revised Statutes, e.g., medical corporations and legal corporations, reveal a strong public policy against having anyone other than a licensed professional participate in the affairs of a professional corporation. Otherwise an erosion of the professional character of the services rendered by such corporations is feared. However, the facts of this case do not raise any of the policy considerations underlying the prohibition against non-professional shareholders voting the shares of stock in the Optometry Corporation.
The defendants cite La. Atty. Gen. Op. No. 80-1275(A) of August 6, 1987 in support of the proposition that the prohibition against non-professionals voting the shares of the Optometry Corporation would not apply in the instant case, where the only professional shareholder is deceased, and the vote to convert to a business corporation is not an attempt by non-professionals to impinge on the professional practice of optometry. We find this opinion persuasive because of its excellent reasoning, not because we believe that it has any prece-dential authority. In effect, the Attorney General opinion states that we should look to the substance of the conversion to a business corporation and the intent of the legislature in deciding whether to apply the voting prohibition literally. According to this reasoning, the parties will not be required to artificially restructure a transaction to meet with the literal formalities of the law when it is obvious that that is not the intent of the legislature, no public policy is violated, and the result is the same.
h Jn the instant case, there is no reason to require defendants to dissolve the corporation under LSA-R.S. 12:1122 prior to transferring the assets to a business corporation. Moreover, NKP could have bought the stock of the Optometry Corporation directly. Even a non-professional may purchase stock in a professional corporation. The letter from NKP’s attorney stating that the stock cannot be sold to a business corporation is in error. Nothing in the statutes concerning professional corporations of any type limits the classes of persons or entities entitled to own shares, or the transferability of those shares. The limitations on the voting rights and earnings rights of non-professional shareholders of professional corporations are not limitations on who has the right to own shares in such corporations. Therefore, there is no reason why NKP, a business corporation, could not acquire the shares of the Optometry Corporation and dissolve the corporation itself, leaving it with the assets. In other words, the statute does not prevent a business corporation from winding up with the assets of the Optometry Corporation, and there is no public policy issue involved.
Therefore, it makes no difference whether the Optometry Corporation is dissolved and the assets then transferred to a business corporation, or whether Marjorie just votes her shares to transform the Optometry Corporation into a business corporation.
In the extension agreements, NKP acknowledged that it was aware of the law concerning professional optometry corporations. NKP in its original petition stat *271 ed that it “did offer to simply purchase the assets of the Corporation,” subsequent to its dissolution. Thus it is obvious that all NKP wanted was the assets of the Optometry Corporation. (See also the January 9, 1997 letter from NKP’s counsel to the same effect, quoted above.) There was never any question of [1KNKP acquiring a professional corporation still engaged in the practice of the profession.
Requiring the defendants to go through a dissolution or a conversion to a business corporation rather than a sale of stock would be a mere formality without substance, because the order in which the steps are taken has no bearing on the right to engage in the professional practice of optometry.
Accordingly, we find that there is no prohibition against allowing Marjorie to first amend the charter to convert it into a business corporation. In doing so, NKP does not suggest that Marjorie would be practicing optometry. Marjorie has no right to engage in the unlicensed practice of optometry regardless of whether she owns shares in a business corporation or a professional optometry corporation, or whether she owns the assets of the dissolved Optometry Corporation directly.
NKP’s real problem has to do with the reluctance of its lender to provide financing because of the lack of certainty in this area of the law. There has been no prior case on this issue and it is not surprising that a lender would not choose to rely solely on the opinion of an attorney general, which opinion is binding on no court. Lenders are notoriously finicky in their insistence on legal certainty.
Unfortunately for NKP, its agreement to purchase was not predicated on its ability to obtain financing and uncertainty as to the law in the mind of a lender does not equate to legal impossibility and absolute nullity. More importantly, and again unfortunately, NKP did not elect to attempt to terminate the agreement when it might have, because it still had hopes of pulling off the deal in the near future. The fact that with the benefit of hindsight, NKP’s decision did not lead to the results NKP hoped to achieve, does not mean that it was not a reasonable decision at the time it was made "without the benefit of a crystal ball.
|1frAs NKP has failed to show that the agreement was an absolute nullity, and as we found earlier in this opinion that NKP has no right to recover its deposit under the terms of paragraph six of the Second Extension agreement, in matter number 98-CA-2542, we reverse the judgment of May 29, 1998, and grant the summary judgment in favor of the defendants and against the plaintiff, dismissing plaintiffs case with prejudice. This has the effect of rendering the appeal in matter number 98-CA-0329 moot on the merits. We are unable to address the defendants’ claim for frivolous appeal in matter number 98-CA-0329 because the defendants failed to appeal or file an answer to the plaintiffs appeal.
Prior to the hearing, NKP filed a motion to strike objecting to documents referred to by the defendants which NKP contends are not properly before this Court. We note that none of the documents on either side were properly attested as required by LSA-C.C.P. art. 967. Nevertheless, as both parties offered the same documents for the most part, acknowledged others in their arguments, and there is no dispute as to the authenticity of the documents essential to a resolution of this case, we are able to consider those documents and fully and properly adjudicate this matter, and disregard the others.

REVERSED AND RENDERED AS TO MATTER NUMBER 98-CA-2547; MATTER NUMBER 98-CA-0329 IS MOOT.